UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARY HOSTETLER,

    Plaintiff,

v.

DANIEL P. DRISCOLL,

    Defendant.

Case No. 22-cv-03605-JD

**ORDER RE SUMMARY JUDGMENT**

Plaintiff Mary Hostetler sued her former employer, the Presidio of Monterey Police Department (the Department) for sex discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and retaliation under the same as well as the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* The Department seeks summary judgment on all claims. Dkt. No. 72. The parties' familiarity with the record is assumed. Summary judgment is granted and denied in part.

## I. SEX DISCRIMINATION

The parties' papers were not a triumph of clarity. Plaintiff in particular struggled to frame the issues for decision with clarity. The allegedly discriminatory actions Hostetler presents can be sorted into two buckets: (1) reclassification actions; and (2) EEOC complaint and investigation actions.

### A. RECLASSIFICATION ACTIONS

Summary judgment is granted to the Department on the sex-discrimination claim based on the delay in the transmission of Hostetler's reclassification appeal. Even assuming the delay constitutes an adverse employment action, a reasonable jury could not find the relevant HR employee, Susan Kastner, delayed submitting the appeal request because of Hostetler's sex. Hostetler and her male subordinates submitted their appeal requests to Kastner around the same

time. *See, e.g.*, Dkt. Nos. 73-10; 73-11; 73-12; 92-12 at 244:20-245:14, 246:19-22. Kastner worked on Hostetler's appeal request concurrently with that of one of the male subordinates and so was about equally delayed as to him. See Dkt. Nos. 73-21 at 249:9-250:16; 73-13; 92-12 at 247:8-24. Kastner also explained that the reasons for the delay were an HR staffing shortage and "a large backlog of hiring actions she was processing." Dkt. No. 73-12 at ECF 2; *see also* Dkt. No. 86-9 at 132:25-133:1. That a different HR employee, Dora Clark, offered to help one of the male subordinates but told him not to tell Hostetler, *see* Dkt. No. 86-9 at 136:9-18, does not raise the inference that Kastner discriminated against Hostetler or that Kastner's reasons were pretextual. Kastner said at one point did say she was "helping a male employee who lost $30,000 in pay" with his appeal request while Hostetler's was still pending, *id.* at 132:23-133:8, but Hostetler put forward no evidence that employee was similarly situated to Hostetler. As she testified, "I don't know what his circumstance was." *Id.* at 133:12-14. The evidence does not raise an inference of invidious discrimination or suggest pretext.

Summary judgment is granted insofar as the claim is based on the implementation of the Defense Civilian Personnel Advisory Service (DCPAS) appeal decision. The decision by its own terms applied to Hostetler and required prompt implementation. Dkt. No. 73-35 at ECF 3. Hostetler emphasizes that the decision required the Department to "review[] its classification decisions for identical, similar, or related positions to ensure consistency with this decision," *id.*, but that the Department did not implement the ruling as to other employees (all of whom are said to have been males), Dkt. No. 85 at 14-15, 21. Assuming the claim is properly exhausted, summary judgment is warranted because the Department did not treat Hostetler than a similarly situated employee and, in any event, the Department advanced a legitimate, nondiscriminatory reason that Hostetler fails to show could be found by a reasonable jury to be pretextual.

Undisputed evidence shows the Department delayed implementing the original 2017 nationwide reclassification due to its likely effects on morale and that the 2017 reclassification, once implemented, did in fact severely damage morale among Hostetler and her male subordinates. *See, e.g.*, Dkt. Nos. 72-1 ¶ 6; 74-4 at ECF 46, 52, 85-86. While her appeal was pending, Hostetler reached out to DCPAS about an intervening ruling by the Office of Personnel

Management (OPM) that was said to have "ha[d] significant implications throughout DoD" and was "the subject of continuing discussion here at DCPAS." Dkt. No. 73-34 at ECF 7. Until that point, Hostetler's appeal had been indefinitely suspended, and she was informed that she could either proceed with her appeal, which would be controlled by the OPM ruling, or cancel the appeal. *Id.* When Hostetler opted to continue with her appeal, she was further informed that the OPM decision "has been the subject of considerable discussion . . . to determine how adverse impact on the current GS-083/1811 workforce can be mitigated" because complete reclassification of the relevant workforce "would be very disruptive." *Id.* at ECF 2. DCPAS advised Hostetler that "no other action can be taken until the pending DoD implementing guidelines . . . are approved by the Attorney General. . . . Your appeal was suspended pending resolution of these broader issues which will directly affect the classification of your position. However, in the meantime, the OPM decision is controlling. In proceeding with your appeal, we must apply the conclusions of that decision." *Id.*

The record shows that the DCPAS decision, by its own terms, concerned the classification of supervisory detectives. *See* Dkt. Nos. 72-2 ¶ 3-5; 73-35 at ECF 2, 4. Hostetler did not advance any evidence that the others at the Department to whom the decision's reasoning should have applied, but was not, were supervisory detectives and therefore similarly situated. In addition to the general concern across the Army about the disruptive consequences of the OPM decision, *see* Dkt. No. 73-34 at ECF 2, once Hostetler's appeal was decided, there was concern at the Department that employees would quit if they thought they would be adversely reclassified, *see* Dkt. Nos. 73-36 at 288:5-23; 86-12 at 289:1-24. Consequently, leadership at the Department sought to avoid advertising the ramifications of Hostetler's appeal after informing the relevant persons at M-COM of the decision. *See* Dkt. No. 73-36 at 286:12-288:23; *see also* 72-2 ¶ 4.

Overall, the record establishes that the appeal decision was implemented to Hostetler by individuals outside the Department but not to her male colleagues because she was a supervisory detective and because the Department was in a hold position pending further developments that might mitigate the disruptive consequences of the OPM decision, as the DCPAS had been, because regulations required the decision's prompt implementation as to Hostetler. *See, e.g.*, Dkt.

3

Nos. 73-36 at 288:1-24; 73-34; 73-35 at ECF 3; 74-3 at ECF 16. Hostetler did not advance evidence that rises above the speculative level to demonstrate there were similarly situated employees to whom the decision was not applied or that the stated reason was pretextual.

Hostetler's claim will go forward to the extent it is predicated on the "revocation of police officer status" and Hostetler being placed on the "no draw" list. Dkt. No. 85 at 21. Due to the 2017 reclassification, Hostetler and her subordinates had new requirements to meet, including attending the Army Civilian Police Academy and passing a medical evaluation, agility test, and weapons training qualification. *See, e.g.*, Dkt. Nos. 73-7 at 294:1-19; 87 ¶ 30. Of the five Department employees subject to the reclassification (Hostetler and four men), Hostetler was not permitted to attend the Academy training while two of the men were permitted to go and the other two were exempted because they previously attended. *See* Dkt. No. 87 ¶ 30. Despite her expressing a desire to attend the Academy, *see* Dkt. No. 73-4 at 165:16-25, Hostetler was told she was not permitted to go because she was "grandfathered in," *see* Dkt. No. 87 ¶ 30. After seeking clarification on that point, she received different, vague, or unhelpful answers. *See, e.g.*, Dkt. Nos. 73-17 at ECF 3-7; 73-18. The Department said that Hostetler was not "grandfathered in" for the agility and weapons training requirements but gave no reason when Hostetler inquired for the discrepancy with respect to the Academy requirement. *See* Dkt. No. 87 ¶ 31. When Hostetler was placed on the no-draw list, assertedly due to medical reasons, she was not permitted to carry a weapon, *see* Dkt. No. 90-7 at ECF 3, but one of Hostetler's male colleagues never "had [his] gun or badge taken away" even when on the no-draw list, *see* Dkt. No. 86-10 at 205:10-22.

This and other evidence establish a prima facie case that the Department discriminatorily enforced the no-draw list and the new requirements following the 2017 reclassification against Hostetler, resulting in her missing out on a training opportunity she wished to attend and having her firearm taken away, based on her sex.[1] *See Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000) (noting the "degree of proof" for a prima facie case "on

---

[1] The Court previously determined that Hostetler "cannot sue for discrimination . . . based on discrete acts that predate June 25, 2018." Dkt. No. 19 at 3. Despite flowing from the 2017 nationwide reclassification, these discrete acts occurred in mid-to-late 2018 because the Department held off on implementing the 2017 reclassification. *See, e.g.*, Dkt. No. 72-1 ¶ 6.

4

1    summary judgment is minimal" (citation omitted)); *see also Davis v. Team Elec. Co.*, 520 F.3d

2    1080, 1089-90 (9th Cir. 2008) (an adverse employment action "materially affects the

3    compensation, terms, conditions, or privileges of employment" (cleaned up))  A reasonable jury

4    could also find the Department's shifting rationales were pretextual.  *See Taybron v. City & Cnty.*

5    *of San Francisco*, 341 F.3d 957, 960-61 (9th Cir. 2003).

**B.     EEO COMPLAINT AND INVESTIGATION ACTIONS**

Summary judgment is granted insofar as Hostetler's claim is based on the allegedly poor handling of the EEO complaint she filed.  She relies on two types of evidence for this charge: that certain Department employees "admitted" to treating her EEO complaint differently than others' complaints and that best practices were not followed during the investigation into her complaint.  *See* Dkt. No. 85 at 11.  Neither raises a non-speculative inference of discrimination.

To start, the record does not support Hostetler's characterization of the employees' testimony.  For example, Hugh Hardin, the Deputy Garrison Commander, testified that he did not know how long the investigation into her complaint lasted and that he never met with Hostetler about her complaint.  *See* Dkt. No. 86-7 at 134:9-14, 147:14-149:4.  Hostetler did not explain how that testimony suggests discriminatory treatment and did not identify evidence that Hardin acted differently with respect to similarly situated employees.  *See Frasco v. Flo Health, Inc.*, --- F.R.D. ---, 2025 WL 1433825, at *16 (N.D. Cal. May 19, 2025) ("The Court will not 'root through the record' for other evidence that [a party] did not identify." (citation omitted)).  Similarly, Dora Clark testified she received training on how to perform workplace investigations and helped draft Department policy recommending that witness interviews for workplace investigations be "held in a private location between the investigator and the person that's being questioned."  Dkt. No. 86-5 at 30:7-31:13.  Hostetler says that her EEO complaint was not so handled, but she offers no evidence that Clark had any role in how interviews would be conducted for the investigation into Hostetler's complaint.

The evidence establishes the investigation was conducted by LaWanda Roper, an EEO Complaints Investigator from the Investigations and Resolutions Directorate in the Department of Defense and an individual *outside* the Presidio of Monterey Police Department.  *See, e.g.*, Dkt.

Nos. 86-10 at 122:1-25; 92-2.  Consequently, evidence of asserted irregularities or inadequacies in Hostetler's EEO investigation do not raise an inference that Department employees discriminated against her, because Roper was responsible for the investigation, and there is no evidence Roper was influenced by, or acted at the behest of, anyone at the Department.

The claim will go forward to the extent it is based on the handling of the EEO complaints filed against Hostetler by her subordinates.  When her subordinates complained to Shawn Marshall, Hostetler's supervisor, that she was micromanaging them, Marshall classified the complaints as alleging a hostile work environment and conducted the investigation into the allegations himself.  *See, e.g.*, Dkt. No. 86-8 at 46:23-47:21.  The complaints were settled by an agreement involving Marshall that moved Hostetler's subordinates to a different supervisor, effectively stripping her of her supervisory duties.  *See* Dkt. Nos. 74-10; 74-11.  Fact disputes abound with respect to the motivations and execution of the investigation and settlement.  One of the subordinates who was involved in the settlement agreement testified that he did not recall making an EEO complaint, *see* Dkt. No. 86-10 at 175:15-176:23, another of Hostetler's supervisors characterized the "micromanaging" conduct underlying the asserted hostile work environment claims as "reasonable" supervisory activities, *see* Dkt. No. 86-11 at 199:20-202:21, and Marshall previously made gendered comments about Hostetler, like that he "didn't even know that [Hostetler] owned a dress," Dkt. No. 86-10 at 108:5-9.

The Department's arguments to the contrary are not well taken.  It points to evidence that Marshall would "smirk" and comment in surprise that certain male employees owned suits.  *See* Dkt. No. 92-14 at 297:23-298:2.  Rather than negating an inference of discriminatory intent, a reasonable jury could conclude from this evidence that Marshall had a habit of evaluating and commenting on his colleagues on the basis of sex- or gender-based stereotypes.  *See, e.g.*, *Lam v. Univ. of Hawaii*, 164 F.3d 1186, 1188 (9th Cir. 1998).   The Department says Hostetler fails to establish a prima facie case because her pay and job title did not change for the months during which she had no supervisees.  Dkt. No. 74-2 at 17.  If this is meant to suggest there was no adverse employment action, the argument falters.  *See, e.g.*, *Chaung*, 225 F.3d at 1126.  Finally, the Department avers it had a nondiscriminatory reason for these actions -- to deal with the EEO

1  complaints against Hostetler. *See* Dkt. No. 74-2 at 17-18. The comment ignores the evidence

2  suggesting the complaints, investigation, and settlement were pretextual or infected with

3  discriminatory animus. *See, e.g.*, *Brown v. Potter*, 457 Fed. App'x 668, 673 (9th Cir. 2011)

4  (unpub.) (reversing grant of summary judgment because of fact disputes "as to how the actions [a

5  plaintiff's] supervisors took ought to be viewed").

## II. RETALIATION

Summary judgment is denied on Hostetler's retaliation claim. To show a prima facie case of retaliation, Hostetler need only adduce evidence that (1) she engaged in a protected activity; (2) was then subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *See Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997). This framework controls for Hostetler's retaliation claims under Title VII, the ADEA, and the Rehabilitation Act. *See Hostetler v. Wormuth*, No. 22-cv-3605-JD, 2023 WL 6795411, at *3 (N.D. Cal. Oct. 12, 2023) (collecting cases). An adverse employment action is one "likely to deter employees from engaging in protected activity." *Id.* (quoting *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000)). Hostetler filed her formal EEO complaint in September 2018, in which she named Marshall as a respondent and alleged sex, age, and disability discrimination. *See* Dkt. No. 87-1. When Hostetler's subordinates complained to Marshall a few months later in early March 2019, *see, e.g.*, Dkt. No. 74-4 at ECF 55, Marshall handled the investigation into Hostetler and the settlement that resulted in her supervisees being transferred to another supervisor, *see, e.g.*, Dkt. Nos. 74-10; 74-11; 86-8 at 46:23-47:21. Those actions plainly constitute adverse employment actions for purposes of retaliation, and a jury will need to resolve the fact disputes over whether Marshall's actions and handling of the EEO complaints against Hostetler, and ensuing settlement, were retaliation for her filing a complaint against him just a few months earlier.[2]

---

[2] Hostetler mentions her "long history of protected activities" in connection with her retaliation claim, Dkt. No. 85 at 25 n.14, but she does not point to any evidence suggesting a non-speculative causal link between those activities and specific actions taken against her after June 25, 2018. Hostetler similarly gestures to other individuals' actions for this claim but made no effort to explain or point to evidence of how those individuals took adverse employment actions against her that were causally linked to her EEO complaint or any other protected activity.

### III. CONSTRUCTIVE DISCHARGE

A constructive discharge occurs when "looking at the totality of the circumstances, a reasonable person in the employee's position would have felt that he was forced to quit because of intolerable and discriminatory working conditions." *Thomas v. Douglas*, 877 F.2d 1428, 1434 (9th Cir. 1989) (cleaned up). Though constructive discharge is generally a fact question for the jury, a plaintiff "must at least show some aggravating factors, such as a continuous pattern of discriminatory treatment." *Id.* (cleaned up). Summary judgment is granted on Hostetler's constructive discharge theory because there is not evidence from which a reasonable jury could find that Hostetler's working conditions were, when she retired in 2022, "so 'difficult or unpleasant' or 'intolerable' that a reasonable person would have been compelled to quit." *Id.*

Hostetler points to the same evidence on which she relied for her discrimination and retaliation claims.[3] *See* Dkt. No. 85 at 27. As discussed, much of that evidence fails to furnish a non-speculative basis from which a jury could find that she was discriminated against on the basis of sex. *See supra* Part I.A-B. Consequently, the only two events that do so suffice and for which Hostetler has adduced evidence are the revocation of her police officer status and placement on the "no draw" list following the 2017 reclassification and her subordinates' EEO complaints and settlement against her in 2019. Those events, which occurred three-to-four years prior to her retirement, "[do] not constitute an 'aggravated situation' that would force a reasonable person to resign," *Nolan v. Cleland*, 686 F.2d 806, 813 (9th Cir. 1982) (citation omitted), particularly where she went back to supervising detectives starting in April 2020, *see, e.g.*, Dkt. Nos. 73-7 at 289:18-290:7; 73-33.

Hostetler relies on *Nolan* for the proposition that discrete incidents of differential treatment over the course of several years create genuine issues of fact for the jury, *see* Dkt. No. 85 at 27, but that case is readily distinguished. There, the earliest discrete instance of discrimination to which the Ninth Circuit looked occurred two years before the plaintiff left her employer, and the

---

[3] It is unclear if Hostetler advances a constructive discharge theory solely for her sex discrimination claim or also for her retaliation claims. The Court construes the argument broadly, favorably to Hostetler, because in any event the record does not show any material fact disputes.

8

most recent instance of discrimination occurred two months before the plaintiff quit. *See Nolan*, 686 F.2d at 810, 813.  To be sure, the discriminatory and retaliatory incidents need not be incessant, or continue up to the day on which the employee quits, but incidents occurring three years prior to that day do not establish a "pattern" of discriminatory treatment that makes working conditions so "intolerable." *Thomas*, 877 F.2d at 1434 (citation omitted).

Finally, insofar as Hostetler attempts to rely on various allegedly discriminatory and retaliatory adverse actions taken against her before June 25, 2018, to support her constructive discharge claim, it is unavailing.  The Court previously concluded that she "did not assert a hostile work environment claim in this lawsuit" and that "claims based on events before June 25, 2018, are stale." Dkt. No. 19 at 3-4.  Hostetler cannot now make an end-run around those rulings under the guise of constructive discharge.

## IV.   REMAINING MATTERS

A few points remain to be addressed.  Hostetler again alleges the Department engaged in impermissible spoliation of evidence, which she says precludes summary judgment.  Dkt. No. 85 at 16-18.  The point is not well taken.  The Court rejected her prior spoliation argument in denying the motion for sanctions.  *See* Dkt. Nos. 41, 51.  In renewing the allegation in her opposition to summary judgment, Hostetler neither explained how her current argument differs from the one previously rejected nor put forward any new evidence to support the allegation.  Consequently, the Court sees no basis for disturbing its prior conclusion that Hostetler did not meet her burden under Rule 37(e).  *See* Dkt. No. 51.  To the extent Hostetler contends that summary judgment should be denied due to alleged gamesmanship during discovery, *see* Dkt. No. 85 at 16, the complaint comes too late.  There was ample opportunity to raise these discovery disputes with the Court, particularly at the discovery-resolution conference on December 9, 2024.  *See* Dkt. No. 62.

Turning to remedies, the Department is entitled to judgment on Hostetler's claims for injunctive and declaratory relief.  Hostetler did not meaningfully respond to the Department's contention that she lacked standing to pursue these remedies because there is no evidence suggesting she will return to the Department following her retirement in 2022.  *See* Dkt. Nos. 72 at 25; 85 at 28.  Hostetler says that the statutes permit such relief, *see* Dkt. No. 85 at 28, but that fact

is of no moment where Hostetler is not entitled to such relief because nothing in the record suggests she will or may attempt to return to her position with the Department. With respect to the Department's contention that Hostetler is not entitled to lost wages or benefits, *see* Dkt. No. 72 at 24, the Court defers resolution to trial.

## CONCLUSION

Summary judgment is denied on Hostetler's sex discrimination claim insofar as it is predicated on the revocation of her police officer status and placement on the "no draw" list following the 2017 reclassification and the handling of her subordinates' EEO complaints against her. Summary judgment is also denied on her retaliation claims in connection with Marshall's handling of her subordinates' EEO complaints against her and is deferred with respect to the question of lost wages. Summary judgment is granted in all other respects.

**IT IS SO ORDERED.**

Dated: August 5, 2025

JAMES DONATO
United States District Judge